686 A.2d 795

TEXTAR PAINTING CORPORATION, PLAINTIFF, v. DELAWARE RIVER PORT AUTHORITY, A JOINT PUBLIC CORPORATE INSTRUMENTALITY OF THE STATE OF NEW JERSEY AND THE COMMONWEALTH OF PENNSYLVANIA; JUPITER PAINTING CONTRACTING CO., INC.; MANGANAS PAINTING COMPANY; DYNAMIC PAINTING CORPORATION; AHERN PAINTING CONTRACTORS; AND GEORGE CAMPBELL PAINTING CORPORATION, DEFENDANTS.

Superior Court of New Jersey
Law Division Camden County

Decided March 29, 1996.

*Jeffrey P. Blumstein* for plaintiff (*Szaferman, Lakind, Blumstein, Walter* and *Blader,* attorneys).

*Dante J. Romanini* for defendant Delaware River Port Authority (*Kozlov, Seaton, Romanini* and *Brooks,* attorneys).

*William H. Kenney* for defendant Jupiter Painting Contracting Co., Inc. (*Archer & Greiner,* attorneys).

ORLANDO, A.J.S.C.

This is an action in lieu of prerogative writs, filed by Textar Painting Corporation (hereinafter Textar), to enjoin the Delaware River Port Authority (hereinafter DRPA) from rejecting its bid to paint the Commodore Barry Bridge because Textar does not possess a QP–1 and QP–2 certification from the Painting Contractor Certification Program (PCCP) of the Structural Steel Painting Council (SSPC).

The DRPA is a public entity authorized by Congress and created by an interstate compact between the State of New Jersey and the Commonwealth of Pennsylvania. The DRPA is responsible for the operation and maintenance of four major bridges; the

Betsy Ross Bridge, the Ben Franklin Bridge, the Walt Whitman Bridge and the Commodore Barry Bridge. The Commodore Barry Bridge spans the Delaware River between Chester County, Pennsylvania and Gloucester County, New Jersey.

During the last several years the Commodore Barry Bridge has begun to exhibit signs of coating failure and paint deterioration. The DRPA, therefore, engaged a nationally recognized consultant, KTA–Tater, to evaluate and prepare contract specifications for the required maintenance work on the Commodore Barry Bridge. KTA–Tater recommended that the deteriorated areas of the Bridge receive spot painting and the paint coating on the steel curved barrier along both sides of the entire length of the bridge be removed and replaced. Since the project requires the removal, collection and disposal of lead paint, KTA–Tater recommended that, in order for a bidder on the project to be deemed qualified the bidders must possess a QP–1 and QP–2 certification from the SSPC.

The SSPC is an industry group that establishes standards by which bridges are cleaned and painted. The group is composed of a consortium of owners, engineers, painting contracting firms and suppliers. The group develops standard specifications for the removal of coatings and painting of bridges. Most technical requirements for coatings that are set forth in the specifications for the painting of bridges refer to standards established by the SSPC.

During the late 1980's there was recognition of the harmful effects which lead paint had on the health of humans and on the environment. This understanding led to comprehensive regulatory oversight affecting the performance of lead paint removal projects such as that involved with the painting project regarding the Commodore Barry Bridge. Current regulations necessitate that there be programs regarding worker safety, including health monitoring and personal protection, as well as environmental protection which requires containment, removal and disposal of lead paint, along with the monitoring of air, water and soil. The

SSPC developed QP–I and QP–2 certifications to improve the quality of surface preparation and coating applications on bridges while at the same time ensuring worker safety and environmental protection.

The QP–1 Certification Program's objective is to determine if a given painting contractor has the personnel, organization, qualifications, procedures, knowledge and capabilities to produce quality surface preparation and coating applications for complex industrial structures. The QP–2 Certification Program is designed to assess the competence of a contractor in order to protect health and safety of workers, as well as the environment, while successfully completing industrial hazardous paint removal projects. The QP Certification Programs also involve a review of the applicant's administrative capabilities by an independent auditor, along with a field audit in which the investigator examines the quality of the work being performed and the safety procedures. The auditors performing these tasks are independent of the SSPC. There is a growing trend among owners and agencies to require that contractors performing work on bridges possess a QP–1 and QP–2 certification. The States of Virginia, West Virginia, Maryland and Connecticut now require QP–1 and QP–2 certifications for bridge painting contractors. The New Jersey Port Authority and recently the New Jersey State Highway Authority required QP–1 and QP–2 certifications for projects.

The DRPA determined that in order for a contractor to be deemed qualified for the Commodore Barry Bridge project, it would need to possess both QP–1 and QP–2 certifications. On December 13, 1995, the DRPA issued an invitation to tender bids for a painting contract of the Commodore Barry Bridge. This notice set forth that a contractor would need to possess QP–1 and QP–2 certifications by January 30, 1996, the date of the bid opening. Any bid without the required QP–1 and QP–2 would be deemed non responsive. Thereafter, the DRPA issued an amended Special Provision 39 which provided that the QP–1 and QP–2 certification could either be full or interim and the date by which

such certification would need to be received by the DRPA was extended from the bid opening date of January 30, 1996 to February 9, 1996. On January 30, 1996, the DRPA received the following bids for the painting of the Commodore Barry Bridge:

| | |
|---|---|
| Textar Painting Corporation | $4,829,000.00 |
| Jupiter Painting Contracting Co., Inc. | $4,943,000.00 |
| Manganas Painting Company | $7,987,000.00 |
| Dynamic Painting Corporation | $9,485,967.00 |
| George Campbell Painting Corporation | $9,773,900.00 |

Although Textar had applied in July of 1995 for its QP–1 and QP–2 certifications, it had not received them as of the date of the bid opening or as of February 9, 1996.[1]

Jupiter Painting Contracting Co., Inc, the second lowest bidder has its QP–1 and QP–2 certifications. Textar filed this Order to Show Cause to enjoin the DRPA from deeming its bid as non-responsive because of its failure to possess the QP–1 and QP–2 certifications. Textar argues that it is unreasonable and arbitrary to require a contractor possess QP–1 and QP–2 certifications in order to be deemed qualified. Textar notes that it is pre-qualified by both the State of New Jersey and the Commonwealth of Pennsylvania for steel painting. During the last year Textar successfully completed work in Burlington County and Somerset County which required stripping, sandblasting and repainting of entire bridges. Recently, Textar was awarded a contract by the New Jersey Department of Transportation for bridge painting work in Bergen and Hudson Counties. Textar contends that the DRPA, through a review of the Bid and Qualification Statement, is able to determine if a bidder is responsible and experienced. Thus, to require that a contractor possess QP–1 and QP–2 certifications in order to be deemed qualified is unnecessary and anti competitive according to Textar.

---

[1] A contractor who applies for SSPC certification will generally receive an answer in one and one-half to three months from the date on which the application is submitted.

This court denied Textar's application for a temporary restraining order and now the matter is before this court as a result of a plenary hearing.

A threshold issue is whether the decisions of the DRPA in determining qualifications of bidders is reviewable by this court. The DRPA was created through an interstate compact between the State of New Jersey and the Commonwealth of Pennsylvania, *N.J.S.A.* 32:3–2. Thus, the DRPA is not an agency of either New Jersey or Pennsylvania, but rather a public corporate instrumentality of both states. *Eastern Paralyzed Veterans v. Camden,* 111 *N.J.* 389, 398, 545 *A.*2d 127 (1988). Therefore, neither state can unilaterally impose duties, powers or responsibilities upon the bi-state agency. *Nardi v. Delaware River Port Authority,* 88 *Pa. Cmwlth.* 558, 490 *A.*2d 949 (1985).

The DRPA emphasizes that neither the interstate compact which creates the agency, nor the bylaws which govern its administration, requires public bidding for contract purchases. The DRPA compares this to the interstate compact creating the Delaware River Joint Toll Bridge Commission, *N.J.S.A.* 32:8–1 through –23. Under that contract, New Jersey and Pennsylvania have expressly required competitive bidding for work in excess of $10,000.00. *N.J.S.A.* 32:8–3.9(a). Therefore, the DRPA argues that because the compact establishing it does not expressly provide for the public bidding of contracts, this court is without jurisdiction to review its decisions regarding the award of contracts, including decisions as to the qualifications of contractors. However, the fact that the legislation creating the bi-state agency does not expressly provide for the public bidding of contracts or a standard by which the agency's decisions regarding the qualifications of bidders may be reviewed, is not dispositive of the issue. Rather, if there is complementary or parallel legislation in Pennsylvania and New Jersey regarding a particular topic or subject, the DRPA is subject to such legislation. *Eastern Paralyzed Veterans v. Camden, supra* 111 *N.J.* at 398, 545 *A.*2d 127.

Thus, this court's inquiry must now turn to whether the laws in New Jersey and Pennsylvania on the bidding of public contracts are substantially similar. Both New Jersey and Pennsylvania have a strong public policy of awarding public contracts through open public competitive bidding. The New Jersey Supreme Court has stated that the purpose of competitive bidding in New Jersey is to "secure competition and to guard against favoritism, improvidence, extravagance and corruption." *Hillside Township v. Sternin* 25 *N.J.* 317, 322, 136 *A.*2d 265 (1957); *see also The Matter of On–Line Games Contract,* 279 *N.J.Super.* 566, 653 *A.*2d 1145 (App.Div.1995) (the court noted that a major objective of public bidding is to promote honesty and integrity of those bidding and of the system itself).

The courts in Pennsylvania have expressed a similar policy. In *Yohe v. The City of Lower Burrell,* 418 *Pa.* 23, 26, 208 *A.*2d 847, 850 (1965), the Pennsylvania Supreme Court stated:

> Bidding requirements are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. [footnotes omitted.] 10 McQuillan, Municipal Corporations § 29.29, at 266–67 (3d ed.1950).

Clearly, the policy of both states is complementary and thus, open competitive bidding is applicable.

Furthermore, not only do New Jersey and Pennsylvania have a strong public policy favoring open competitive bidding of public contracts, but each has a similar standard for review of agency decisions as to bid specifications and the qualifications of bidders. In *George Harms Construction v. Turnpike Authority,* 137 *N.J.* 8, 644 *A.*2d 76 (1994), the New Jersey Supreme Court was presented with the issue of whether the New Jersey Turnpike Authority could require, as part of its bid specifications, that prospective contractors enter into project labor agreements requiring the designation of a particular labor organization for public construc-

tion work.  In setting forth the standard by which the Turnpike Authority actions were to be reviewed, the Supreme Court stated:

> Courts have only a limited role to play in reviewing the actions of other branches of government.  In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited.  *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n*, 93 *N.J.* 384, 390, 461 *A.2d* 575 (1983).  Courts can intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy.  Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.  *Campbell v. Dept. of Civil Service*, 39 *N.J.* 556, 562, 189 *A.2d* 712 (1963).
>
> [*Id.* at 27, 644 *A.2d* 76.]

Thereafter, the Appellate Division in *The Matter of On–Line Games Contract, supra* 279 *N.J.Super.* 566, 653 *A.2d* 1145 determined that with respect to state contracts, the decisions of the Treasurer as to the responsibility of the bidder and bid conformity are to be tested by the arbitrary and unreasonable standard.

Similarly, in the case of *McIntosh Road Materials Company v. Woolworth*, 365 *Pa.* 190, 74 *A.2d* 384 (1950), the Pennsylvania Supreme Court was called upon to review a determination by the Secretary of Capital Property and Supplies as to which contractor was the lowest responsible bidder for a highway repair contract. In examining the matter, the court stated that the actions of public officials in the area of public contracts would not be overturned, except upon a clear showing of abuse of discretion.

Thus, New Jersey and Pennsylvania have each determined that a decision by a public agency, as to whether or not a particular bidder is qualified will not be set aside unless the decision of the public agency is arbitrary and unreasonable so as to constitute an abuse of discretion.  Both New Jersey and Pennsylvania have a strong policy favoring open competitive bids of public contracts, and each has determined that the decisions of public agencies in determining whether or not a particular bidder is qualified will be

reviewed by the court under an arbitrary and unreasonable standard. Therefore, the actions of the DRPA are reviewable by this court. That is to say, the determination by the DRPA to include the QP–1 and QP–2 certifications as a pre-qualification standard for bidders on the repainting of the Commodore Barry Bridge is subject to review under the arbitrary and unreasonable standard.

■ Having determined that the decision of the DRPA with respect to bidders qualifications is subject to judicial review, I find that it is not arbitrary or unreasonable for the DRPA to require a contractor seeking the painting contract for the Commodore Barry Bridge to possess a QP–1 and a QP–2 certification. The DRPA, as the owner of the bridge is obligated to establish standards on a project that ensures the safe-guarding of the workers on the project, the residents in the area of the project, the travelling publics and the environments. In recent years, a growing recognition of the harmful effects of lead-based paint has led to many changes in the regulatory requirements for the removal of paint and the repainting of bridges that have previously been painted with lead-based paints.

The SSPC is a nationally recognized consortium that develops standards for the removal and coating of steel structures. The standards developed by the SSPC have been part of the bridge painting industry for many years. The QP–1 and QP–2 certification programs developed by the SSPC review the capability of the contractor to properly perform the contract. The DRPA does not possess the resources or the staff to audit the contractors. The pre-qualification programs for state bidding contracts do not evaluate quality control, nor do they evaluate the safety programs of a particular contractor. Evaluation of a contractor's quality control program and safety standards program are critical elements in the QP–1 and QP–2 certification process.

Furthermore, it should be noted that the requirement for a contractor having a QP–1 and QP–2 certification did not unreasonably restrict the number of bidders on this project. On a project

of this size, there are usually four to seven bidders. On this particular project there were five bidders.

Indeed, Textar itself recognizes the value of a QP–1 and a QP–2 certification, having applied for same in July of 1995. Other States, including a state agency in New Jersey, have required a QP–1 and a QP–2 certifications for projects. The decision by the DRPA that a responsible bidder for the Commodore Barry Bridge project possess a QP–1 and QP–2 certification on or before February 9, 1996 was a reasonable decision to assure that the work performed was done in a technically correct and safe manner so that persons and the environment would not be endangered.

Accordingly, the complaint of Textar is hereby dismissed.