800 A.2d 97

RALPH S. BALLINGER, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. DELAWARE RIVER PORT AUTHORITY, PAUL DRAYTON, VINCENT BORRELLI, RICHARD SULLIVAN, ALVIN WOODHOUSE, DAVID J. MCCLINTOCK AND ALAN DANIELS, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS.

Argued April 29, 2002—Decided June 25, 2002.

*Jennifer J. Platzkere,* argued the cause for appellants and cross-respondents (*Blank Rome Comisky & McCauley,* attorneys; *Ms. Platzkere, Peter A. Gold* and *Sophia Lee,* on the briefs).

*Mario A. Iavicoli,* argued the cause for respondent and cross-appellant.

The opinion of the Court was delivered by

COLEMAN, J.

This appeal presents two issues of first impression: first, whether the Delaware River Port Authority (DRPA) and its employees are subject to the New Jersey Conscientious Employee Protection Act (CEPA); second, if they are not, whether they are subject to the New Jersey common law principle that protects employees from being discharged in violation of a clear mandate of public

policy. Because DRPA is a bi-state agency, a unique creature of a federally approved compact between two states, this Court must determine as a threshold matter the proper methodology to apply in resolving when one state can impose obligations on a bi-state agency.

I.

Plaintiff Ballinger appeals from grants of summary judgment in favor of defendant DRPA and its individual employees. Accordingly, in reviewing those motions for summary judgment, we must accord plaintiff the benefit of all reasonable inferences that may be drawn from the evidence submitted by the parties. *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

From April 1984 until February 8, 1995, defendant DRPA employed plaintiff Ralph S. Ballinger as a non-union police officer. In November 1994, Ballinger noticed that pieces of furniture began appearing at the DRPA building where he was assigned to work. He also overheard a conversation between another officer and Captain Alvin Woodhouse, one of Ballinger's supervisors, concerning the furniture. According to Ballinger, the officer was laughing and said that there was an old, abandoned RCA building in Camden where a security guard would let him in and "you could just go down and take whatever you wanted." Ballinger knew that just a few days prior to that discussion DRPA and Camden Police had been called to investigate burglaries and vandalism in the very same building.

Ballinger did not know "how far [up the ranks] this went as far as hearing Captain Woodhouse ask for furniture." So, when he happened to see a long-time personal and family friend, Captain Bernard Gallagher of the New Jersey State Police, he sought advice from the Captain concerning what if anything he should do. Acting on Captain Gallagher's suggestion, Ballinger took photographs of the furniture and sent them along with a letter to Captain Gallagher. By communicating information about the

perceived illegal activities [1] in that manner, Ballinger went outside his chain of command as a DRPA police officer and thereby violated DRPA policies and procedures. The DRPA learned about Ballinger's independent investigation and correspondence with Captain Gallagher. By letter dated February 8, 1995, the DRPA terminated Ballinger for disregarding his chain of command and disclosing information about the DRPA to an outside agency.

In December 1995, Ballinger filed a one-count complaint alleging that the DRPA terminated his employment in violation of CEPA, *N.J.S.A.* 34:19–1 to –8. Ballinger later amended that complaint to include CEPA claims against DRPA employees Paul Drayton, Vincent Borrelli, Richard Sullivan, Alvin Woodhouse, David McClintock and Alan Daniels, individually. The DRPA and the individual employees filed motions to dismiss for failure to state a claim. The trial court granted the motions on the ground that CEPA does not apply to DRPA or its employees because DRPA cannot be subjected to the unilateral action of any one of its member states' legislatures. The Appellate Division affirmed, finding that CEPA was not "substantially similar" to Pennsylvania's Whistleblower Law such that the claim could proceed. *Ballinger v. Del. River Port Auth.*, 311 *N.J.Super.* 317, 327–29, 709 A.2d 1336 (App.Div.1998) (*Ballinger I*).

The trial court also denied Ballinger's cross-motion to file another amended complaint to include common law retaliatory discharge claims. The Appellate Division reversed and remanded, instructing the trial court to make "a painstaking comparison of the common laws of New Jersey and Pennsylvania, like the one we engaged in as to CEPA and the Whistleblower Law." *Id.* at 332,

---

[1] No criminal charges relating to the furniture ever were filed by the State Police. According to DRPA Investigator David J. McClintock, some form of agreement had been reached in the fall of 1994 between the Camden Redevelopment Agency and DRPA. That agreement purportedly allowed certain DRPA employees to take items from the closed RCA building. Ballinger was unaware of that agreement; notice of it apparently was not given to all DRPA employees.

709 *A.2d* 1336. On remand, the trial court dismissed the amended complaint, finding "no similarity in the common law of New Jersey and Pennsylvania that applies to this cause of action by this plaintiff." The Appellate Division reversed in an unpublished decision. *Ballinger v. Del. River Port Auth. (Ballinger II)*. The court subsequently amended its decision, on motion by DRPA, to allow the claims against the individual employees to proceed. *Ballinger v. Del. River Port Auth. (Ballinger III)*.

We granted DRPA's petition for certification concerning the holding in *Ballinger II* that a common law claim for wrongful discharge can be asserted against DRPA. 170 *N.J.* 207, 785 *A.2d* 436 (2001). That petition also requested review of *Ballinger III*, which we also granted, regarding the liability of the individual employees. In addition, we granted Ballinger's cross-petition for certification to decide whether the Appellate Division was correct in *Ballinger I* in holding that CEPA does not apply to DRPA. 171 *N.J.* 443, 794 *A.2d* 182 (2002). We now affirm the holdings in all three *Ballinger* cases.

## II.

### A.

The threshold question presented in this appeal is the extent to which DRPA, as a bi-state agency, may be subject to New Jersey law. The compact does not mention CEPA; nor does it contain any provision that would expressly allow or preclude the application of CEPA. The compact also is arguably silent concerning whether DRPA may be subject to the common law of either Pennsylvania or New Jersey and, if so, to what extent.

The State of New Jersey and the Commonwealth of Pennsylvania created the direct predecessor to DRPA, the Delaware River Joint Commission, in 1931. *N.J.S.A.* 32:3–1 to –18; *Pa. Stat. Ann.* tit. 36, §§ 3503 to 3509. That interstate compact was approved by the United States Congress in 1932. *Pub. Res.* 26, *ch.* 258, 47 *Stat.* 308 (1932). The Joint Commission was created for the

purpose of developing and maintaining interstate transportation routes, namely bridges and port facilities, between the two states. *N.J.S.A.* 32:3–2; *Pa. Stat. Ann.* tit. 36, § 3503, art. I. In 1951, New Jersey and Pennsylvania changed the name of the Joint Commission to the Delaware River Port Authority. *Id.*

 A compact between states, entered into under the authority of the Compact Clause of the United States Constitution, *U.S. Const.* art. I, § 10, cl. 3, is an agreement that binds the signatory states and their citizens. *West Virginia ex rel. Dyer v. Sims,* 341 *U.S.* 22, 28, 71 *S.Ct.* 557, 560, 95 *L.Ed.* 713 (1951). Congressional approval of an interstate compact is necessary when the compact "enhances state power [at the expense] of the National Government." *United States Steel Corp. v. Multistate Tax Comm'n,* 434 *U.S.* 452, 473, 98 *S.Ct.* 799, 813, 54 *L.Ed.*2d 682 (1978). When Congress approves an interstate compact, the agreement becomes " 'the law of the Union,' *Del. River Joint Toll Bridge Comm'n v. Colburn,* 310 *U.S.* 419, 427, 60 *S.Ct.* 1039, 1040, 84 *L.Ed.* 1287, 1289 (1940), [whose] interpretation [of which] is a question of federal law." *Eastern Paralyzed Veterans Ass'n, Inc. v. City of Camden,* 111 *N.J.* 389, 397, 545 *A.*2d 127 (1988) (citing *Cuyler v. Adams,* 449 *U.S.* 433, 438 n. 7, 101 *S.Ct.* 703, 707 n. 7, 66 *L.Ed.*2d 641, 648 n. 7 (1981) (discussing how "the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question.")). That is not to say that state courts lack jurisdiction. Rather, it means "only that if the contracting states dispute their respective obligations under a compact, [then] the United States Supreme Court has the *final* say." *State v. Murphy,* 36 *N.J.* 172, 187, 175 *A.*2d 622 (1961).

 "[B]istate entities created by compact . . . are not subject to the unilateral control of any one of the States." *Hess v. Port Auth. Trans–Hudson Corp.,* 513 *U.S.* 30, 42, 115 *S.Ct.* 394, 402, 130 *L.Ed.*2d 245 (1994). "[A] single state cannot dictate the policy of a bi-state agency." *Eastern Paralyzed Veterans Ass'n, supra,* 111 *N.J.* at 407, 545 *A.*2d 127; *accord Bell v. Bell,* 83 *N.J.* 417, 424, 416 *A.*2d 829 (1980) (finding that all signatory states must " 'enact

laws involving and regulating the bi-state agency' ") quoting *Del. River & Bay Auth. v. N.J. Pub. Employment Relations Comm'n,* 112 *N.J.Super.* 160, 165–66, 270 *A.*2d 704 (App.Div.1970), *aff'd o.b.,* 58 *N.J.* 388, 277 *A.*2d 880 (1971). Therefore, all parties agree that "the unilateral imposition of additional duties on the authority . . . is impermissible absent express authorization in the compact or joint legislation by the two creator states." *Del. River Port Auth. v. Commonwealth, State Ethics Comm'n,* 137 *Pa.Cmwlth.* 170, 585 *A.*2d 587, 589 (1991). Neither of those exceptions applies in this case.

■ Courts applying Pennsylvania law do not necessarily agree with this Court's holding that "[t]he corollary of the proposition that neither state may individually impose its will on the bi-state agency is that the agency may be made subject to complementary or parallel state legislation." *Eastern Paralyzed Veterans, supra,* 111 *N.J.* at 400, 545 *A.*2d 127; *accord Bunk v. Port Auth. of N.Y. & N.J.,* 144 *N.J.* 176, 184, 676 *A.*2d 118 (1996). Under the "complementary or parallel legislation" principle, one compact state's statute can be applied to the bi-state agency if it is "substantially similar" to an enactment of the other state. *Eastern Paralyzed Veterans, supra,* 111 *N.J.* at 401, 545 *A.*2d 127. That principle applies even where the statutes at issue do not expressly refer to the bi-state agency. *Fraternal Order of Police, Penn–Jersey Lodge 30 v. Del. River Port Auth.,* 323 *N.J.Super.* 444, 453–54, 733 *A.*2d 545 (App.Div.), *certif. denied,* 162 *N.J.* 663, 745 *A.*2d 1213 (1999), *cert. denied,* 530 *U.S.* 1275, 120 *S.Ct.* 2743, 147 *L.Ed.*2d 1007 (2000) (*Lodge 30*). Although DRPA contends otherwise, state courts in both New Jersey and Pennsylvania have recognized that complementary state legislation may be applied to DRPA and other bi-state agencies. *See, e.g., Int'l Union of Operating Eng'rs, Local 68 v. Del. River & Bay Auth.,* 147 *N.J.* 433, 447, 688 *A.*2d 569 (finding substantially similar laws concerning collective bargaining negotiations in New Jersey and Delaware to be effective modification of compact requiring defendant DRBA to negotiate collectively with employees), *cert. denied,* 522 *U.S.*

861, 118 *S.Ct.* 165, 139 *L.Ed.*2d 108 (1997) (*Local 68*); *Del. River Port Auth. v. Commonwealth, State Ethics Comm'n, supra*, 585 *A.*2d at 588 (finding New Jersey and Pennsylvania did not have substantially similar ethics laws); *Nardi v. Del. River Port Auth.*, 88 *Pa.Cmwlth.* 558, 490 *A.*2d 949, 952 n. 10 (1985) (finding New Jersey and Pennsylvania did not have substantially similar disability compensation laws but noting that "identical legislation would [not] be required to give effect to the intent of the legislatures if it were clear that such intent was to confer a benefit on [DRPA] employees").

Notwithstanding those state court decisions, the United States District Court for the Eastern District of Pennsylvania recently rejected the theory that one state's legislation need only be "complementary or parallel" to, or evidence substantially similar public policies as, the other state's law in order for it to apply to DRPA. *Del. River Port Auth. v. Fraternal Order of Police*, 135 *F.Supp.*2d 596, 602 (E.D.Pa.2001). Instead, that court adopted an "express intent" standard as controlling the interpretation of the compact. *Ibid.* According to that court, the express intent standard would require: "(1) that New Jersey and Pennsylvania have enacted legislation that expressly imposes a duty upon the DRPA; and (2) that the legislation enacted by each state imposing the duty on DRPA [be] substantially similar." *Id.* at 609. DRPA urges us to apply that standard. But after oral argument in this case, the United States Court of Appeals for the Third Circuit reversed the District Court. *Del. River Port Auth. v. Fraternal Order of Police*, 290 *F.*3d 567 (3d Cir.2002). The Third Circuit found that DRPA had a duty to bargain collectively because, as previously decided by a New Jersey state court, " 'the New Jersey statutes and the Pennsylvania statutes are complementary and parallel.' " *Id.* at 578 (quoting *Lodge 30, supra*, 323 *N.J.Super.* at 459, 733 *A.*2d 545). The Third Circuit reasoned that when the parties agreed to litigate an issue of federal law in a state court, the appeals court would not reconsider the state court judgment in a subsequent action. *Id.* at 577. We, therefore, apply the Third Circuit's holding and reaffirm our prior conclusion that the "com-

plementary or parallel" legislation test is to be applied in determining whether the subsequent laws of one compacting state will apply to a bi-state agency.

## B.

■ We now address whether DRPA may be subject to the common law and, if so, to what extent. DRPA argues that since neither state may unilaterally impose additional duties on it, such obligations may be imposed only through legislation enacted by both states that expressly includes DRPA. To support that position, DRPA relies on the provision of the compact that states that DRPA "shall also have such additional powers as may hereafter be delegated to or imposed upon it from time to time by the action of either State *concurred in by legislation of the other.*" *N.J.S.A.* 32:3–5; *Pa. Stat. Ann.* tit. 36, § 3503, art. IV(q) (emphasis added). According to DRPA, because the two states never expressly agreed to the imposition of the common law, DRPA cannot now be subject to the common law absent express legislative consent. We disagree.

Under the compact, DRPA has the power to "sue and be sued." *N.J.S.A.* 32:3–5(b); *Pa. Stat. Ann.* tit. 36, § 3503, art. IV(b). The "sue and be sued" provision "is considered a waiver of sovereign immunity." *Bell, supra,* 83 *N.J.* at 423, 416 *A.*2d 829; *accord Kozikowski v. Del. River Port Auth.,* 397 *F.Supp.* 1115, 1120 (D.N.J.1975) (finding the "sue and be sued" clause to be a waiver of sovereign immunity against suit in federal court); *cf. Hess, supra,* 513 *U.S.* at 32–33, 115 *S.Ct.* at 397, 130 *L.Ed.*2d at 251 (holding "bistate railway, the Port Authority Trans–Hudson Corporation (PATH), is not cloaked with the Eleventh Amendment immunity that a State enjoys"). If DRPA's authority to institute common law suits against others is derived from the power to sue, then logically the power to be sued infers the corollary proposition: a plaintiff can sue DRPA to enforce a common law claim.

We reject DRPA's position that the "sue and be sued" clause operates only within the confines of the compact. That is, when

DRPA is the party suing it apparently assumes it may take advantage of expanding common law, but when it is being sued it contends that it may not be subject to common law obligations without express legislative consent. *Cf. Interstate Wrecking Co. v. Palisades Interstate Park Comm'n*, 57 *N.J.* 342, 347, 273 *A.*2d 10 (1971) (rejecting defendant agency's argument "that the sue and be sued clause, though broad in terms, must be viewed as restricted by other provisions in the compact"). Even if that were so, plaintiff correctly points out that the compact does not state that only a member state's Legislature may impose duties on DRPA contrary to defendant's argument. Subsection (m) of the enumerated powers section of the compact provides that DRPA may "exercise the powers, duties, authority and jurisdiction heretofore conferred and imposed on [it] by the Commonwealth of Pennsylvania or the State of New Jersey, or both of the said two States." *N.J.S.A.* 32:3–5(m). That subsection is not limited to legislative law; rather, it broadly applies to all the laws of the two states.

"Bi-state agencies such as the [DRPA] do not exist in a vacuum." *Del. River Port Auth. v. Commonwealth, State Ethics Comm'n, supra*, 585 *A.*2d at 588. As Chief Justice Weintraub once stated in a case involving a different bi-state agency whose compact also contained a "sue and be sued" provision:

> The [agency] is not a separate level of government somewhere between the federal government and the contracting states. It is part of the government of each of the states. . . .
>
> . . . [T]he states did not create a governmental authority and cut the umbilical cord. . . . *As the agent of each state, the [agency] is subject to all of its laws, whether of statutory or common law origin, except insofar as the states agreed expressly or by fair implication to place it beyond them.*
>
> [*State v. Murphy, supra*, 36 *N.J.* at 186, 175 *A.*2d 622 (emphasis added) (requiring agency to produce transcripts in a criminal case, notwithstanding internal agency rule that transcripts were confidential).]

We conclude that the common law can be applied to the extent it fills a void in the compact. *See, e.g., New Jersey v. New York*, 523 *U.S.* 767, 784, 118 *S.Ct.* 1726, 1737, 140 *L.Ed.*2d 993 (1998) (resolving territorial dispute between New York and New Jersey

regarding Ellis Island by following "common-law rule [that] speaks in the silence of the Compact").

"[J]ust as a state through its legislature may deal with specific circumstances menacing the peace by an appropriately drawn act, so the law of a state may be fitted to a concrete situation through the authority given by the state to its courts." *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies,* 312 *U.S.* 287, 297, 61 *S.Ct.* 552, 557, 85 *L.Ed.* 836 (1941) (citation omitted). The common law, unlike statutory law, is "flexible" and "adapts itself to varying conditions." *Funk v. United States,* 290 *U.S.* 371, 383, 54 *S.Ct.* 212, 216, 78 *L.Ed.* 369 (1933); *accord Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 438, 625 *A.*2d 1110 (1993). And, undoubtedly, the common law is as much a part of the law of a state as is statutory law. *Magnolia Petroleum Co. v. Hunt,* 320 *U.S.* 430, 445, 64 *S.Ct.* 208, 216, 88 *L.Ed.* 149 (1943) (citing *Erie R.R. Co. v. Tompkins,* 304 *U.S.* 64, 78, 79, 58 *S.Ct.* 817, 822, 823, 82 *L.Ed.* 1188 (1938)). In this case, a legislative agreement between the states created the compact, but the application of common law allows the compact to function in a manner that is consistent with public expectations.

In the past, DRPA has been both subject to and has asserted the common law. *See, e.g., Kozikowski, supra,* 397 *F.Supp.* at 1116–17 (asserting third-party complaint in personal injury action for indemnification against defendant who designed and constructed bridge); *Bell, supra,* 83 *N.J.* at 425, 416 *A.*2d 829 (allowing tort action for personal injuries arising from alleged negligent maintenance of bridge); *Yancoskie v. Del. River Port Auth.,* 478 *Pa.* 396, 387 *A.*2d 41, 46 (1978) (allowing suit in trespass for personal injuries arising from alleged negligent failure to follow safety standards in constructing bridge); *Del. River Port Auth. v. Thornburgh,* 137 *Pa.Cmwlth.* 7, 585 *A.*2d 1123, 1124 n. 1 (1991) (asserting claim and counterclaim for breach of contract against Pennsylvania Department of Transportation). In the process of asserting common law claims, the DRPA also has relied on changes in the common law since 1931 when the compact was formed. *See, e.g.,*

*Thornburgh, supra,* 585 *A.*2d at 1128 (relying on Pennsylvania Supreme Court case from 1957 regarding oral modification, and two cases from the 1980s regarding agency principles as applied to defendant Department of Transportation). Indeed, DRPA undoubtedly has benefited from the evolution of the common law. *See, e.g., Textar Painting Corp. v. Del. River Port Auth.,* 296 *N.J.Super.* 251, 258, 686 *A.*2d 795 (Law Div.1996) (dismissing complaint against DRPA after finding substantially similar common law in New Jersey and Pennsylvania from the 1950s through 1990s that favored competitive bidding).

Although the common law may be a source of the imposition of duties on DRPA, the common law of those two states, like the statutory law, must be substantially similar so that its application not be deemed a unilateral imposition. *See Local 68, supra,* 147 *N.J.* at 444, 688 *A.*2d 569. That is the test that properly was applied by the Appellate Division in *Ballinger I* and *Ballinger II.* Since that time, the test has been recognized and applied by the federal courts. *See Moore v. Del. River Port Auth.,* 80 *F.Supp.*2d 264, 266, 269 (D.N.J.1999) (applying the "substantial similarity test" in analyzing a common law employment claim brought against the DRPA). We hold that the "substantial similarity" test applies to common law claims as well as statutory law claims and now affirm the decision in *Ballinger I* on that issue.

### III.

Having determined that the appropriate test to apply in deciding whether the law of one state may be applied to a bi-state agency is whether or not the laws of the two states, either common law or statutory law, are substantially similar, we now must decide whether CEPA is similar to Pennsylvania's Whistleblower Law, and whether the two states would allow a common law claim for wrongful discharge on the facts in this record.

### A.

In his cross-petition, Ballinger argues that the Appellate Division erred in finding that CEPA is not substantially similar to

Pennsylvania's Whistleblower Law. In order to be deemed substantially similar, the two laws at issue must "evidence some showing of agreement." *Local 68, supra,* 147 *N.J.* at 445, 688 *A.*2d 569. In other words, the New Jersey and Pennsylvania legislatures must "have adopted a substantially similar policy" that is apparent in their respective statutes. *See id.* at 447, 688 *A.*2d 569.

■ As the court in *Ballinger I* found, the two laws differ in: (1) scope; (2) filing period; (3) damages; and (4) right to trial by jury. *Ballinger I, supra,* 311 *N.J.Super.* at 327–28, 709 *A.*2d 1336. First, CEPA applies to both public and private employers, while the Whistleblower Law applies only to public employers. *Compare N.J.S.A.* 34:19–2a *with Pa. Stat. Ann.* tit. 43, § 1422. Second, although CEPA allows up to one year for a claim to be filed, *N.J.S.A.* 34:19–5, the Whistleblower Law requires the claim to be filed within 180 days, *Pa. Stat. Ann.* tit. 43, § 1424(a), which alone would have precluded Ballinger's claim if brought under the Whistleblower Law. Third, the Whistleblower Law, unlike CEPA, does not allow punitive damages. *Compare N.J.S.A.* 34:19–5f *with Pa. Stat. Ann.* tit. 43, § 1425. Finally, the Whistleblower Law, unlike CEPA, does not allow trial by jury. *Compare N.J.S.A.* 34:19–5 *with Wilhelm v. Borough of Braddock,* 28 *Pa. D. & C.* 4th 211, 212 (Ct. of C.P.1996) (construing Whistleblower Law).

Most important, however, those differences reflect that the goals of the overriding legislative schemes are different. As the Pennsylvania Supreme Court stated:

[W]e believe that the Whistleblower Law is not primarily designed to punish an employer for harboring retaliatory motives, but is, rather, chiefly a remedial measure intended to "enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." In enacting the statute, the General Assembly aimed to effectuate such design by ensuring that employees are not discouraged from reporting violations of legal or ethical codes. Additionally, recovery under the statute is proportionate to the harm suffered, as punitive damages are not available. Finally, we are unaware of any authority providing that whistleblower statutes are primarily punitive, rather than remedial, in that their chief purpose is to punish employers for harboring bad motives.

[*O'Rourke v. Commonwealth, Dep't of Corr.*, 566 *Pa.* 161, 778 *A.*2d 1194, 1202–03 (2001) (internal citations omitted).]

In contrast, New Jersey's legislation is more far-reaching. "The purpose of the CEPA is to 'protect employees who report illegal or unethical work-place activities.'" *Higgins v. Pascack Valley Hosp.*, 158 *N.J.* 404, 417, 730 *A.*2d 327 (1999) (quoting *Barratt v. Cushman & Wakefield of New Jersey, Inc.*, 144 *N.J.* 120, 127, 675 *A.*2d 1094 (1996)). Therefore, beyond being simply a compensatory measure affecting only government action, "CEPA establishes a statutory exception to the general rule that an employer may terminate an at-will employee with or without cause." *Higgins, supra*, 158 *N.J.* at 418, 730 *A.*2d 327. That exception, in turn, is intended to protect the public interest, namely "the public health, safety, and welfare." *Id.* at 420, 421, 730 *A.*2d 327. Consequently, a fair reading of CEPA and the Whistleblower Law indicates that they are not "complementary or parallel" legislation so as to subject DRPA to CEPA.

▮ Having determined that CEPA does not apply to DRPA, we also express our agreement with the court in *Ballinger I* that Ballinger's ineffective attempt to bring a CEPA claim does not constitute a waiver of common law causes of action. The waiver provision in CEPA provides:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.
>
> [*N.J.S.A.* 34:19–8.]

This Court previously has decided that the waiver provision does not prohibit a plaintiff from also asserting a common law claim that is distinct from the CEPA claim. *Young v. Schering Corp.*, 141 *N.J.* 16, 25–26, 660 *A.*2d 1153 (1995). As the Appellate Division in *Ballinger I* noted, *Young* expressly left open the question "whether the statutory waiver is applicable if the CEPA claim is withdrawn or otherwise concluded prior to judgment on

the merits." *Id.* at 32, 660 A.2d 1153. We now answer that question.

Since the decision in *Young,* the Appellate Division in *Crusco v. Oakland Care Center, Inc.,* 305 *N.J.Super.* 605, 610, 702 A.2d 1363 (1997), has concluded that the filing of a CEPA claim that was barred by the CEPA statute of limitations did not also bar plaintiff's right to subsequently bring a common law wrongful discharge claim. The *Crusco* court recognized that, as discussed above, "CEPA was adopted as remedial legislation, designed to expand employee protection, and patently not to be used as a weapon to limit employees in vindicating their rights after suffering retaliation for conduct warranting protection." *Ibid.* (citing *Barratt, supra,* 144 *N.J.* at 127, 675 A.2d 1094; *Young, supra,* 141 *N.J.* at 26, 660 A.2d 1153; *Abbamont v. Piscataway Bd. of Educ.,* 138 *N.J.* 405, 418, 650 A.2d 958 (1994)).

The court in *Ballinger I* applied the logic of *Crusco* to conclude that Ballinger "erroneously pled an unavailable CEPA claim, and thus no bar attaches in respect of other available claims of wrongful discharge." *Ballinger I, supra,* 311 *N.J.Super.* at 332, 709 A.2d 1336. We agree with the Appellate Division that *Crusco* was decided correctly. The determination of whether a viable CEPA claim could be brought against DRPA could be made only by a court of law. This Court now having decided that the claim cannot be brought, plaintiff Ballinger should not now be denied any possible rights that may still exist under our state common law. Accordingly, we affirm *Ballinger I.*

### B.

Ballinger has asserted a common law wrongful discharge claim against DRPA and certain individuals alleging that his termination violated a clear mandate of public policy and therefore constituted a wrongful discharge under *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 417 A.2d 505 (1980). Ballinger claims that, as a police officer, his public duty was to investigate suspected criminal activity and report such activity to the State Police.

He maintains that DRPA violated a public policy when it terminated him in retaliation for reporting such activity. Although DRPA claims that it terminated Ballinger not for reporting the activity, but for reporting it by going outside his chain of command as required by DRPA internal rules and regulations, Ballinger responds that DRPA's reason is merely pretextual.

An overview of the duties and responsibilities incumbent on a DRPA police officer is helpful in understanding the issue presented. In 1957, New Jersey and Pennsylvania each passed legislation permitting the DRPA to appoint police officers to maintain "safety and preserve order" on DRPA bridges and tunnels. See *N.J.S.A.* 32:4–6; *Pa. Stat. Ann.* tit. 36, § 3504.1. Initially, that legislation provided that DRPA police officers acting on DRPA property "shall have the power and authority to make arrests for any crimes, misdemeanors, and the offenses committed under the laws of" either New Jersey or Pennsylvania. *Id.* The legislation further provided that the DRPA may administer to such police officers "an oath or affirmation faithfully to perform the duties of their respective positions or offices." *Id.*

A number of years later, in 1986 and 1994 respectively, New Jersey and Pennsylvania adopted legislation to confer full police power on DRPA police acting on non-DRPA property. *L.* 1986, c. 209; 1994 *Pa. Laws* 792, No. 110. That legislation provides that DRPA police officers acting in "any other areas of the port district ... shall have all of the powers, including the right to carry firearms while on duty, and all of the immunities conferred by law on police officers or municipal police officers in the enforcement of the laws of" either New Jersey or Pennsylvania. *Id.* (codified at *N.J.S.A.* 32:4–6; *Pa. Stat. Ann.* tit. 36, § 3504.1); *accord* Senate Independent Authorities Committee, State of New Jersey, *Statement to S. Bill 2287* (Sept. 15, 1986) (stating "The bill ... confers on DRPA police officers acting within the port district all of the powers and immunities enjoyed by other police officers in New Jersey and Pennsylvania."); Remarks of Pennsylvania Senator Salvatore on Senate Passage, June 14, 1994, *S.B.* 1751, 1994 *Pa.*

*Legis. J.* 2308 (stating that the legislation afforded DRPA police officers full police powers on DRPA property as well as "those police powers, privileges and immunities as the laws of [Pennsylvania or New Jersey] confer upon municipal police officers while beyond the territorial limits of their primary jurisdiction."). Thus, it is clear that under the compact, DRPA police officers are required and are expected to function as would other police officers in either New Jersey or Pennsylvania.

In both New Jersey and in Pennsylvania, "[t]he fundamental duty of a policeman ... is to be on the lookout for infractions of the law and to use due diligence in discovering and reporting them." *City of Asbury Park v. Dep't of Civil Serv.*, 17 *N.J.* 419, 429, 111 *A.*2d 625 (1955) (citation omitted); *accord In re Funds in the Possession of Conemaugh Township Supervisors*, 562 *Pa.* 85, 753 *A.*2d 788 (2000), *aff'g* 724 *A.*2d 990, 994 (Pa.Commw.Ct.1999) (stating that "[o]ne of the most important duties entrusted to police officers is the safeguarding of the property of the citizens of [Pennsylvania]. Another is the gathering of evidence of crimes."); *Commonwealth v. Blagman*, 458 *Pa.* 431, 326 *A.*2d 296, 298 (1974) (stating that "[t]he police have an absolute duty to both the public and the accused to investigate the circumstances of a crime...."). The duty of a police officer to investigate crime is, in part, statutory. *See, e.g., N.J.S.A.* 53:2-1 (providing that New Jersey State Police "shall have power to prevent crime, to pursue and apprehend offenders and to obtain legal evidence necessary to insure the conviction of such offenders."); *Pa. Stat. Ann.* tit. 71, § 250(d) (imposing duty on Pennsylvania State Police to cooperate with local police to detect crime and preserve "law and order").

 Under the common law of New Jersey, an employee has a cause of action for wrongful discharge if an employee is terminated in violation of a "clear mandate of public policy." *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions" as well as professional codes of ethics under certain circumstances. *Ibid.* "An employee who is

wrongfully discharged may maintain a cause of action in contract or tort or both." *Ibid.* "In a tort action, a court can award punitive damages to deter improper conduct in an appropriate case." *Ibid.*

Likewise in Pennsylvania, an employee has a tort cause of action for wrongful discharge if an employee is terminated in violation of a "clear mandate of public policy." *Geary v. United States Steel Corp.*, 456 *Pa.* 171, 319 *A.*2d 174, 180 (1974); *accord Werner v. Zazyczny*, 545 *Pa.* 570, 681 *A.*2d 1331, 1335 (1996). That "clear mandate of public policy" must be

so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interest of the public weal.

[*Shick v. Shirey*, 552 *Pa.* 590, 716 *A.*2d 1231, 1235–36 (1998) (quoting *Mamlin v. Genoe*, 340 *Pa.* 320, 17 *A.*2d 407, 409 (1941)).]

In adopting a common law cause of action in New Jersey, the *Pierce* Court relied on *Geary* as well as case law from several other states. *Pierce, supra*, 84 *N.J.* at 67, 73, 417 *A.*2d 505. Pennsylvania courts, in turn, have relied on the language in *Pierce* quoted above, *id.* at 72, 417 *A.*2d 505, regarding the sources of public policy. *See Yetter v. Ward Trucking Corp.*, 401 *Pa.Super.* 467, 585 *A.*2d 1022, 1026, *appeal denied*, 529 *Pa.* 623, 600 *A.*2d 539 (1991); *Darlington v. Gen. Elec.*, 350 *Pa.Super.* 183, 504 *A.*2d 306, 319 (1986); *Cisco v. United Parcel Servs., Inc.*, 328 *Pa.Super.* 300, 476 *A.*2d 1340, 1343 (1984) (quoting *Pierce, supra*, 84 *N.J.* at 72, 417 *A.*2d 505). Therefore, in comparing the common law of the two states, it is clear that each state permits a common law claim for wrongful discharge in violation of a clear mandate of public policy.

We next address whether the public policy alleged here to have been breached, wrongful retaliation against a law enforcement officer for reporting suspected criminal activity, is a "clear mandate of public policy" that would be actionable in both states. Given that both states look to the same sources for public policy,

the appropriate question becomes whether there is a "dominant theme that appears from our legislation and case law?" *Bunk, supra,* 144 *N.J.* at 191, 676 *A.*2d 118; *accord Local 68, supra,* 147 *N.J.* at 447, 688 *A.*2d 569 (finding that, "[a]s a matter of public policy, the legislatures of both states have concluded that public employees should have the right of collective negotiation and that employers should not interfere with that right").

In dismissing Ballinger's common law claim, however, the trial court stated:

> [Counsel] mentioned the dominant theme and the Whistleblower statute in Pennsylvania and the CEPA statute in New Jersey. Both have the same dominant theme. If that were the test, then that would be all that is necessary to determine whether or not each state has a dominant theme or a public policy to advance. It's something like nobody's against Mom and apple pie. But that's not what the Appellate Division said in this case. They did a comparison of the statutory language in the Pennsylvania's Whistleblower statute and a comparison to—to the New Jersey CEPA statute and I think that's what I'm required to do here without regard to the dominant theme because everybody agrees as to the value of a dominant theme.

We agree with the Appellate Division that the trial court "took a too restrictive view of both the Pennsylvania common law and [the Appellate Division] directive."

Where there is a dominant theme that clearly appears in the common laws of the creator states, failure to apply those laws "would be the failure to apply so important a policy to an entity created by both states for their mutual benefit." *Local 68, supra,* 147 *N.J.* at 447, 688 *A.*2d 569. Both creator states in this case clearly regard the fundamental duty of a police officer to be enforcement of the laws. Ballinger, as a DRPA police officer, expressly has "all of the powers . . . and all of the immunities" of law enforcement in both states. *N.J.S.A.* 32:4–6; *Pa. Stat. Ann.* tit. 36, § 3504.1. Thus, by the terms of the compact, Ballinger is held by the creator states to the same standard as all other state and local police officers, including the duty to investigate suspected criminal wrongdoing. Because Ballinger alleges that he was fired for investigating and reporting suspected criminal activity,

Ballinger has stated a claim for wrongful discharge under the law of both New Jersey and Pennsylvania.

Nonetheless, DRPA claims that the facts of this case would not support a cause of action in Pennsylvania. DRPA argues that Pennsylvania does not have a public policy claim for "whistle blowing" and cites a number of cases in support of that proposition. Those cases, however, are distinguishable. First, the cases involve civilians, not police officers, who had no statutory duty to "blow the whistle." See *McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 *Pa.* 307, 750 *A.*2d 283, 284 (2000) (involving office manager who complained to superiors about breathing in air with toxic chemical levels); *Spierling v. First Am. Home Health Servs., Inc.*, 737 *A.*2d 1250, 1254 (1999) (finding that nurse had no statutory duty to seek out and report Medicare fraud by employer hospital), *appeal denied*, 567 *Pa.* 728, 786 *A.*2d 989 (2001). Moreover, the other cases that also involve civilians do not involve suspected illegal activity, see *Holewinski v. Children's Hosp. of Pittsburgh*, 437 *Pa.Super.* 174, 649 *A.*2d 712, 715 (1994), *appeal denied*, 540 *Pa.* 641, 659 *A.*2d 560 (1995) (involving hospital administrator who voiced concerns about proposed head of department), or the actual reporting of wrongdoing to a public agency, see *McLaughlin, supra*, 750 *A.*2d at 288 (noting that plaintiff failed to implicate public policy because complained of activity was not reported to state agency); *Krajsa v. Keypunch, Inc.*, 424 *Pa.Super.* 230, 622 *A.*2d 355, 359 (1993) (involving plaintiff who only threatened to report overbilling to authorities).

In contrast, the cases cited by plaintiff are instructive. For instance, *Field v. Philadelphia Electric Co.*, 388 *Pa.Super.* 400, 565 *A.*2d 1170, 1172–74 (1989), involved a wrongful discharge claim brought by an employee who was terminated after reporting deliberate radioactive discharge in excess of permitted levels to the Nuclear Regulatory Commission. The court found that the plaintiff had a valid cause of action under Pennsylvania common law because federal law required employees to report the violation and the matter was one of public concern. *Id.* at 1180.

608

The *Field* court relied on other Pennsylvania cases, including *Reuther v. Fowler & Williams, Inc.,* 255 *Pa.Super.* 28, 386 *A.*2d 119 (1978). In *Reuther,* the court recognized a common law wrongful discharge claim when an employee was terminated after serving jury duty as required by statute. *Id.* at 120–21. Ballinger, like the plaintiffs in *Field* and *Reuther,* had a statutory duty to enforce the law which, under the law of both states, is a paramount public duty. Accordingly, based on existing Pennsylvania case law, we disagree with DRPA that Ballinger's conduct is not protected. We therefore affirm *Ballinger II.*

## C.

Finally, the individual defendants argue that, because they were not acting outside the scope of their employment, they cannot be individually liable to plaintiff for wrongful discharge. "Whether an employee is or is not acting within the scope of his or her employment, . . . is only relevant in determining whether the employer can be secondarily liable for the employee's tort. In either case, the.employee himself [or herself] remains liable for his [or her] own torts." *Cosmas v. Bloomingdales Bros., Inc.,* 442 *Pa.Super.* 476, 660 *A.*2d 83, 89 (1995). In both New Jersey and Pennsylvania, a claim for wrongful retaliatory discharge may be considered a tort action. *Pierce, supra,* 84 *N.J.* at 67, 72–73, 417 *A.*2d 505; *Geary, supra,* 319 *A.*2d at 177. Therefore, in both states, an individual who personally participates in the tort of wrongful discharge may be held individually liable. *Borecki v. Eastern Int'l Mgmt. Corp.,* 694 *F.Supp.* 47, 56 (D.N.J.1988) (surveying New Jersey case law regarding individually liability for wrongful discharge); *Kamensky v. Roemer Indus. Inc.,* 1 *Pa. D. & C.* 4th 497, 500 (Ct. of C.P.1988).

That conclusion comports with the long-standing rule that "[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." *Restatement (Second) of Agency* § 343 (1958); *see also Restatement (Second) of Agency* § 217B

(1957) (stating that "[p]rincipal and agent can be joined in an action for a wrong resulting from the tortious conduct of an agent or that of agent and principal, and a judgment can be rendered against each."). Thus, as the court in *Ballinger III* indicated under the common law of New Jersey and Pennsylvania "an employee is not relieved of liability simply because he or she acted on behalf of the employer." *Ballinger III, supra,* slip op. at 1 (citing *Printing Mart–Morristown v. Sharp Elecs., Corp.,* 116 *N.J.* 739, 762, 563 *A.*2d 31 (1989); *Cosmas, supra,* 660 *A.*2d at 88). We therefore affirm the judgment in *Ballinger III* denying immunity to the individual defendants for their own tortious conduct.

## IV.

The judgments of the Appellate Division in *Ballinger I, II,* and *III* are affirmed.

*For affirming*—Chief Justice PORITZ and Justices STEIN, COLEMAN, VERNIERO, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.