SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Delaware River Joint Toll Bridge Commission v. George Harms Construction Co., Inc. (A-55-22) (088194)**

**Argued January 3, 2024 -- Decided August 1, 2024**

**WAINER APTER, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the Delaware River Joint Toll Bridge Commission (Commission), a bi-state entity created through an interstate compact (Compact) between New Jersey and Pennsylvania, may require potential bidders to use project labor agreements (PLAs) as part of its public bidding process.

In 1934, New Jersey and Pennsylvania jointly created the Commission through the Compact to construct, acquire, administer, operate, and maintain certain bridges across the Delaware River. In 1935, Congress approved the Compact.

In 2009, the Commission approved a resolution to replace the existing I-95 Scudder Falls Bridge. After the Commission announced that it would accept sealed bids for the bridge replacement project, it authorized its Executive Director to enter into a PLA for the project. The Commission released the PLA publicly, as an addendum to the contract bid documents, in November 2016. The PLA required the selected contractor and all subcontractors to hire at least 75% of their project workforce from identified local unions.

The George Harms Construction Company, Inc. (Harms) is a construction contractor. At the time the Commission released its PLA, Harms was party to a collective bargaining agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Services Workers International Union, AFL-CIO, CLC (USW), which precluded Harms from complying with the terms of the PLA. Harms requested that the Commission include USW in the PLA, or it would seek an injunction to prevent the project from moving forward.

The Commission filed a complaint against Harms seeking a declaration that it was entitled to proceed with the PLA it had issued. Harms asserted counterclaims, alleging that the PLA was unlawful because it excluded USW. Harms did not attack the Commission's authority to enter into PLAs generally.

1

The trial court denied Harms' request for a preliminary injunction, and the Commission awarded the project to the only bidder. The parties filed summary judgment motions, and the trial court held that New Jersey's competitive bidding laws, which Harms claimed barred the use of the PLA, did not apply to the Commission. The court dismissed Harms' counterclaims with prejudice but also dismissed the Commission's complaint because it determined that the lawsuit "was not strictly authorized" by the Commission as a whole.

The Appellate Division affirmed the order dismissing the Commission's complaint for different reasons and reversed the dismissal of certain counterclaims. 475 N.J. Super. 317, 360 (App. Div. 2023). The court held that the text of the Compact "is silent on PLAs" and therefore looked to the test in Ballinger v. Delaware River Port Authority, 172 N.J. 586 (2002). 475 N.J. Super. at 351-52. Because "New Jersey and Pennsylvania have not enacted complementary or parallel legislation or case law and do not have similar common law on PLAs," the appellate court concluded that the Commission lacked the authority to use a PLA. Id. at 355.

The Court granted certification. 254 N.J. 523 (2023).

**HELD:** The plain language of the Compact authorizes the Commission to require the use of a PLA in a publicly bid construction project. The Commission's ability to do so is not constrained by Ballinger.

1. Under the Compact Clause of the United States Constitution, each State possesses the sovereign authority to enter into a compact with another State, subject to Congress's approval. Once Congress approves an interstate compact, the compact becomes the law of the Union. Ballinger's complementary or parallel state law test and the Third Circuit's express intent standard are two competing analyses for when a bi-state compact can be amended. Under Ballinger, "the subsequent laws of one compacting state will apply to a bi-state agency" if both states have "complementary or parallel" legislation on the topic in question or if "the common law" of the two states on the topic is "substantially similar." 172 N.J. at 595-99. The Third Circuit rejected that test and held that subsequent legislation will amend an interstate compact only if both states "exhibit[] [an] express intent to amend the Compact" or apply the subsequent legislation to the interstate entity in question. Int'l Union of Operating Eng'rs, Loc. 542 v. Del. River Joint Toll Bridge Comm'n, 311 F.3d 273, 280 (3d Cir. 2002). (pp. 18-22)

2. The Court explains that although construction on the Scudder Falls Bridge is complete, the question of whether the Compact authorizes the Commission to use a PLA in one of its construction projects is "an issue of public importance that is capable of repetition yet evades review." (pp. 22-23)

2

3.  The Commission's powers are determined first by the express terms of the Compact.  Looking to the Compact's plain text, New Jersey and Pennsylvania granted the Commission power to construct and replace bridges, "enter into contracts" to do so, "determine . . . all other matters in connection with, any and all improvements or facilities" it has the power to construct, and, with the exception of the "power to levy taxes," "exercise all other powers . . . which may be reasonably necessary or incidental" to the Commission's work.  N.J.S.A. 32:8-3, -11; 36 Pa. Stat. Ann. § 3401.  Taken together, these grants of authority are broad enough to encompass the power to require that a party with whom the Commission contracts to build a bridge sign a PLA.  This is true even though the phrase "Project Labor Agreement" does not appear in the text of the Compact.  And it is true even though New Jersey and Pennsylvania could not have contemplated the use of PLAs when they entered into the Compact in 1934 as PLAs did not yet exist.  (pp. 23-25)

4.  The New Jersey and Pennsylvania legislatures amended the statutes that constitute the Compact in 1994 and 1996, respectively, "to require the commission to competitively bid contracts in accordance with the public policies of" those states.  N.J.S.A. 32:8-3.8(d); 36 Pa. Stat. Ann. § 3401.11(4).  Congress, however, never approved those amendments, and it is thus not clear that the Compact itself was properly amended.  Even assuming that it was, that language is not operative law; it is part of the legislative findings and declarations.  The operative portion of the amendments require the Commission to publicly advertise for bids and award the contract to the lowest responsible bidder.  The Commission fulfilled those two obligations for the Scudder Falls Bridge project.  (pp. 26-28)

5.  When two states confer a power on a bi-state entity within the four corners of an interstate compact, there is no basis to look beyond the compact, to other state laws of general applicability that do not mention the compact at all, to determine whether that power exists.  Here, because the Compact's text encompasses the authority to use a PLA, the Appellate Division erred in looking beyond the Compact to determine whether other New Jersey and Pennsylvania laws and policies that do not mention the Commission authorize the use of PLAs.  Even if Ballinger applied, the text of the Compact controls and the Commission's authority to use PLAs remains unconstrained because New Jersey and Pennsylvania do not have complementary or parallel state laws banning the use of PLAs.  The Court therefore does not reach the argument that Ballinger should be overruled in favor of the Third Circuit's "express intent" test.  (pp. 28-29)

  **REVERSED and REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and NORIEGA join in JUSTICE WAINER APTER's opinion.  JUSTICES PIERRE-LOUIS and FASCIALE did not participate.**

SUPREME COURT OF NEW JERSEY

A-55 September Term 2022

088194

Delaware River Joint Toll Bridge Commission,
Wadud Ahmad, Esq., individually and in his
official capacity, Pam Janvey, individually
and in her official capacity, Daniel H. Grace,
individually and in his official capacity,
John Siptroth, individually and in his official
capacity, Garrett Leonard Van Vliet, individually
and in his official capacity, Geoffrey S. Stanley,
individually and in his official capacity, Lori Ciesla,
individually and in her official capacity,
Yuki Moore Laurenti, individually and in her
official capacity, Michael B. Lavery, individually
and in his official capacity, and Joseph J. Resta,
individually and in his official capacity,

Plaintiffs-Appellants,

v.

George Harms Construction Co., Inc.,
and Michael Rainville,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
475 N.J. Super. 317 (App. Div. 2023).

| Argued | Decided |
| --- | --- |
| January 3, 2024 | August 1, 2024 |

Brian P. O'Neill argued the cause for appellants (Chiesa Shahinian & Giantomasi, attorneys; Brian P. O'Neill and Chelsea P. Jasnoff, on the briefs).

Francis V. Cook argued the cause for respondents (Fox Rothschild, attorneys; Francis V. Cook, of counsel and on the briefs, and Jonathan D. Ash, Corinne B. DeBerry, and Ian C. Gillen, on the briefs).

Tim Sheehan, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Sara M. Gregory, Assistant Attorney General, Tim Sheehan, Ian Fiedler, and Kristina L. Miles, Deputy Attorneys General, of counsel and on the brief).

Christopher R. Gibson argued the cause for amicus curiae Delaware River Port Authority (Archer & Greiner, attorneys; Christopher R. Gibson, of counsel and on the brief, and Patrick M. Flynn, on the brief).

Raymond G. Heineman submitted a brief on behalf of amici curiae Eastern Atlantic States Regional Council of Carpenters, United Building Trades Council of Southern New Jersey, Essex County Building and Construction Trades Council, Hudson County Building and Construction Trades Council, and Bergen County Building and Construction Trades Council (Kroll Heineman Ptasiewicz & Parsons, attorneys; Raymond G. Heineman, on the brief).

Benjamin Clarke submitted a brief on behalf of amicus curiae International Union of Operating Engineers Local 825 (DeCotiis, FitzPatrick, Cole & Giblin, attorneys; Vincent M. Giblin, of counsel, Benjamin Clarke, of counsel and on the brief, and William J. Hamilton and Richard F.X. Regan, on the brief).

David Tykulsker submitted a brief on behalf of amicus curiae United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (David Tykulsker & Associates and Nathan Kilbert, Assistant General Counsel, of the Pennsylvania bar, admitted pro hac vice, attorneys; David Tykulsker, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In this appeal, we are asked to consider whether the Delaware River Joint Toll Bridge Commission, a bi-state entity created through an interstate compact between New Jersey and Pennsylvania, may require potential bidders to use project labor agreements as part of its public bidding process. We hold that, under the plain terms of the interstate compact, it may. We therefore reverse the Appellate Division's judgment and remand for further proceedings consistent with this opinion.

I.

A.

In 1934, the State of New Jersey and the Commonwealth of Pennsylvania jointly created the Delaware River Joint Toll Bridge Commission (Commission) to construct, acquire, administer, operate, and maintain certain bridges across the Delaware River. N.J.S.A. 32:8-2; 36 Pa. Stat. Ann. § 3401.

3

New Jersey and Pennsylvania created the Commission through an interstate compact (the Compact) entered into by their respective legislatures. N.J.S.A. 32:8-1 to -30; 36 Pa. Stat. Ann. §§ 3401 to 3416.  Congress approved the Compact, and thereby the Commission, in 1935.  Act of Aug. 30, 1935, Pub. L. No. 74-411 § 9, 49 Stat. 1051, 1058-64, ch. 833; U.S. Const. art. I, § 10, cl. 3.  Congress has also approved amendments to the Compact, agreed to jointly by New Jersey and Pennsylvania, in 1947, 1952, and 1987.

The Compact's preamble declares that "[i]t is highly desirable that there be a single agency" to further New Jersey and Pennsylvania's joint interest in transportation across the Delaware River.  N.J.S.A. 32:8-1; 36 Pa. Stat. Ann. § 3401.  New Jersey and Pennsylvania therefore created the Commission as a "public corporate instrumentality" to exercise "an essential governmental function."  N.J.S.A. 32:8-2; 36 Pa. Stat. Ann. § 3401, art. I.

There are ten commissioners:  five from Pennsylvania and five from New Jersey.  N.J.S.A. 32:9-1; 36 Pa. Stat. Ann. § 3272.  A majority of the commissioners from Pennsylvania and a majority of the commissioners from New Jersey must vote in favor of any action in order for it to be binding. N.J.S.A. 32:8-2; 36 Pa. Stat. Ann. § 3401, art. I.

The Compact sets forth the Commission's "powers and duties" in several different articles.  N.J.S.A. 32:8-1; 36 Pa. Stat. Ann. § 3401.

4

Article X of the Compact grants the Commission the power to "acquire, construct, rehabilitate, improve, maintain, repair and operate bridges for vehicular or pedestrian traffic across the Delaware river" north of Philadelphia County.  N.J.S.A. 32:8-11(a); accord. 36 Pa. Stat. Ann. § 3401, art. X(a).  It also grants the Commission the power to replace an existing bridge "with one or more new bridges."  N.J.S.A. 32:8-11(b); 36 Pa. Stat. Ann. § 3401, art. X(b).

Article II of the Compact grants the Commission the power "[t]o sue and be sued," "[t]o enter into contracts," and "[t]o determine . . . all other matters in connection with[] any and all improvements or facilities which it may be authorized to own [or] construct."  N.J.S.A. 32:8-3(b), (h), and (n); 36 Pa. Stat. Ann. § 3401, art. II(b), (h), and (n).  Article II also grants the Commission the authority

> [t]o exercise all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the powers granted to the commission by this agreement or any amendment thereof or supplement thereto . . . ; and generally to exercise, in connection with its property and affairs and in connection with property under its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.
>
> N.J.S.A. 32:8-3(p); 36 Pa. Stat. Ann. § 3401, art. II(p).

5

B.

In 2000, the Commission identified the I-95 Scudder Falls Bridge as "a high priority for improvement." In 2009, the Commission approved a resolution to move forward with construction of a replacement bridge. At that time, Scudder Falls was the most heavily trafficked of the twenty bridges the Commission maintained. The project was to be funded by collecting tolls on the new bridge.

In 2015, Joseph Resta, the Executive Director of the Commission, asked Keystone Research Center to study the feasibility of using a Project Labor Agreement (PLA) for the new bridge. A PLA "is a form of prehire agreement with labor organizations under which a contractor agrees to use the members of specified labor organizations on a project in exchange for the member unions' guarantees of labor stability." George Harms Constr. Co., Inc. v. N.J. Tpk. Auth., 137 N.J. 8, 14 (1994); see also N.J.S.A. 52:38-2 (defining a PLA as "a form of pre-hire collective bargaining agreement covering terms and conditions of a specific project"); Exec. Order No. 14,063, 87 Fed. Reg. 7,363 (Feb. 4, 2022) (defining a PLA as a "pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project").

Keystone determined that the use of a PLA "would be appropriate" for the Scudder Falls Bridge project. The report explained that a PLA would

> [provide] an adequate supply of consistently high quality skilled labor . . . [;] ensure regular and effective communication among owner, contractors, and building trades . . . [;] prohibit work stoppages and other disruptions . . . [;] help ensure standardization and consistency of work rules across all of the participating trades, promoting efficiency and smooth project operation . . . [;] ensure an increased awareness of safety . . . [;] [and] support an effective workforce diversity . . . program.

In September 2016, the Commission announced that it would accept sealed bids for the bridge replacement project. The notice stated that "[t]he Commission is contemplating the use of a Project Labor Agreement (PLA) for this Contract," but "[a] final decision as to the inclusion of a PLA has not yet been made."

After discussions with labor leaders and the governors' offices of New Jersey and Pennsylvania, the Commission unanimously adopted a resolution authorizing Executive Director Resta to enter into a PLA for the Scudder Falls Bridge project. The Commission released the PLA publicly, as an addendum to the contract bid documents, on November 10, 2016.

The PLA included two building and construction trade councils and their affiliated local unions: the Mercer-Burlington Counties & Vicinity Building Trades Council, AFL-CIO, and the Building and Construction Trades Council

7

of Philadelphia and Vicinity, AFL-CIO (collectively, "Building Trades").

Under the PLA, the more than 30 identified local unions associated with the

Building Trades were recognized as the "sole and exclusive bargaining

representatives of all craft employees" for the Scudder Falls project. The PLA

required the selected contractor and all subcontractors to hire at least 75% of

their project workforce from those identified local unions; otherwise qualified

individuals who were either non-union laborers or members of unions that

were not a party to the PLA could make up no more than 25% of the total

project workforce.

The George Harms Construction Company, Inc. (Harms) is a

construction contractor based in New Jersey. At the time the Commission

released its PLA for Scudder Falls, Harms was party to a collective bargaining

agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Services Workers International Union, AFL-CIO,

CLC (USW).

On November 15, 2016, USW wrote to the Commission and requested

that the PLA be amended to include it. USW explained that a "Harmony

Agreement" between it and the AFL-CIO's Building and Construction Trades

Department permitted workers represented by USW and the Building Trades to

work together on projects.

Harms also wrote to the Commission requesting "USW's inclusion [in the PLA] by close of business December 2, 2016 to avoid the necessity of seeking an injunction to prevent the Project from moving forward with an unlawful PLA." Harms and USW contended that their collective bargaining agreement precluded Harms from complying with the terms of the Scudder Falls PLA and, thus, from bidding on the project.

C.

The Commission filed a complaint against Harms in New Jersey Superior Court, seeking a declaration that it was entitled to proceed with the PLA it had issued.

Harms answered the complaint and asserted counterclaims, alleging violations of New Jersey and Pennsylvania competitive bidding laws; the First and Fourteenth Amendments to the United States Constitution; and New Jersey statutory and constitutional guarantees of the right to bargain collectively. Harms also alleged that the PLA was preempted by federal law. In substance, Harms' counterclaim alleged that "[b]y failing and/or refusing to include the USW as a signatory union to the PLA and to identify it as a 'Local Union,'" the Scudder Falls PLA violated competitive bidding laws. Harms did not attack the Commission's authority to enter into PLAs generally.

Harms sought, among other remedies, a preliminary injunction enjoining the Commission from accepting bids or awarding a contract for the project and an extension of the deadline for submitting bids until after its counterclaims had been adjudicated. After the trial court denied Harms' request for a preliminary injunction, the Commission received and opened project bids. The Trumbull Corporation submitted the sole bid, for an estimated $396 million. Two engineering firms hired by the Commission conducted bid analyses and recommended that the Commission award the project to Trumbull, and the Commission did so.[1] Harms maintains that it would have submitted a bid for $325 million if USW had been added to the PLA.

The trial court then granted Harms' motion to add claims for punitive damages, compensatory damages, and breach of fiduciary duty against the Commission, as well as to name individual counterclaim defendants and to add a counterclaimant.[2] Harms' breach of fiduciary duty claim alleged that the Commission engaged in "political favoritism" by drafting the PLA "to exclude [Harms] and the USW." Harms also sought additional relief, including a declaratory judgment that the Commission was bound by New Jersey and

---

[1] The Scudder Falls project was completed in 2022 and the new Scudder Falls Bridge is open to the public.

[2] Subsequent references to "Harms" refer to the counterclaimants collectively.

Pennsylvania's competitive bidding laws, lost profits and costs to prepare a bid proposal, and other damages.

Harms ultimately moved for summary judgment to dismiss the Commission's complaint with prejudice. Harms also moved for summary judgment on their counterclaims and for sanctions under Rule 1:4-8 and the Frivolous Claims Act, N.J.S.A. 2A:15-59.1, arguing that the Commission had filed its lawsuit without a vote of the entire Commission. The Commission and individual counterclaim defendants cross-moved for summary judgment to dismiss Harms' counterclaims, and the Commission moved for summary judgment on its declaratory judgment claim.

The trial court granted summary judgment dismissing Harms' counterclaims with prejudice. However, the court also determined that because the filing of the Commission's lawsuit "was not strictly authorized" by the Commission as a whole, it would "dismiss the Commission's claims against Harms." The court denied both of Harms' motions for summary judgment and Harms' motion for sanctions.

The court held that New Jersey's competitive bidding laws, which Harms claimed barred the use of the PLA, did not apply to the Commission because "in order to be subject to particular law of one or the other state, the two states have to pass [] substantially similar legislation or the compact has to authorize

11

unilateral legislation or the substantive law of the two states needs to be the same."  It also dismissed Harms' fiduciary duty claim, holding there was no evidence that the Commission engaged in favoritism by not including USW in the PLA.  According to the trial court, "there's nothing in the record in this case to show any corrupting influence on the determination to do a project labor agreement with the Trades Council"; no evidence that any member of the Commission "was interested in favoring the trades over the Steelworkers"; and "no breach of fiduciary duty, certainly by any of the claims of political [cronyism] or favoritism."

D.

Harms appealed, arguing that the PLA violated both New Jersey and Pennsylvania's competitive bidding laws, the First Amendment's protections of free speech and free association, and the fiduciary duty the Commission owed to toll payers.  The Appellate Division granted USW leave to appear as amicus curiae.  USW maintained that "[t]he Scudder Falls Project was precisely the sort of construction project well-suited to a PLA," but the Commission's PLA violated New Jersey and Pennsylvania's competitive bidding laws because it was the result of "undue favoritism of the Building Trades at the expense of USW."

12

The Appellate Division reversed in part, affirmed in part, and vacated in part. Although Harms had not argued that the Commission lacked authority to use a PLA in general, but instead that the PLA the Commission had issued was unlawful because it excluded USW, the court held that "the Commission did not have the authority to approve, use, and enforce a PLA" at all. Del. River Joint Toll Bridge Comm'n v. George Harms Constr. Co., Inc., 475 N.J. Super. 317, 325 (App. Div. 2023).

As an initial matter, although construction of the new Scudder Falls Bridge was complete, the court found that the appeal was not moot because the question of the Commission's power to use a PLA was capable of repetition yet evading review. Id. at 338. The Appellate Division then turned to "whether the Commission had the authority under its compact to approve and use a PLA in its bidding process." Id. at 341. The court first held that the text of the Compact "is silent on PLAs." Id. at 351.

It therefore looked to this Court's test in Ballinger v. Delaware River Port Authority, 172 N.J. 586 (2002), to determine "whether or not the laws of the two states, either common law or statutory law, are substantially similar." Bridge Comm'n, 475 N.J. Super. at 352 (quoting Ballinger, 172 N.J. at 599). After a painstaking survey of New Jersey and Pennsylvania law governing PLAs, the court concluded that New Jersey statutory law generally permits

13

public entities to use PLAs, while PLAs in Pennsylvania "have been governed exclusively by case law from the Pennsylvania Commonwealth Court" and are only permitted under limited circumstances. Id. at 346-49 (citing N.J.S.A. 52:38-3; Allan Myers, LP v. Dep't of Transp., 202 A.3d 205, 216 (Pa. Commw. Ct. 2019)). Because "New Jersey and Pennsylvania have not enacted complementary or parallel legislation or case law and do not have similar common law on PLAs," the Appellate Division concluded that the Commission lacked the authority to use a PLA. Id. at 355.

The Appellate Division affirmed the order dismissing the Commission's complaint, reversed the dismissal of Harms' First Amendment, competitive bidding, and breach of fiduciary duty counterclaims, and vacated the order denying Harms' motion for sanctions, remanding to the trial court for further consideration. Id. at 360-61.

E.

We granted the Commission's petition for certification. 254 N.J. 523 (2023). We also granted leave to appear as amici curiae to the Delaware River Port Authority (DRPA); the Attorney General of New Jersey; the International Union of Operating Engineers Local 825 (Local 825); and a collection of trades councils that includes the Eastern Atlantic States Regional Council of Carpenters, United Building Trades Council of Southern New Jersey, Essex

14

County Building and Construction Trades Council, Hudson County Building and Construction Trades Council, and Bergen County Building and Construction Trades Council (Amici Building Trades).[3]

## II.

### A.

The Commission argues that the Appellate Division erred in finding that the Compact does not authorize the use of PLAs and misinterpreted and misapplied Ballinger. Focusing on the language of the Compact discussed above, the Commission submits that the power to use PLAs falls squarely within the Compact's broad grants of authority. Because the four corners of the Compact encompass the discretion to use a PLA, the Commission contends, the Appellate Division's inquiry should have ended. However, even under Ballinger, which the Commission does not concede applies, the Commission asserts that the Appellate Division's conclusion that "the states did not share complementary and parallel legislation prohibiting the use of PLAs," should have meant that the Commission's power to use a PLA, granted by the Compact, remained unconstrained. Ultimately, petitioner charges, the Appellate Division's decision "negates every general grant of authority written

---

[3] USW continued to participate before this Court, relying only on its brief before the Appellate Division. Because that brief did not address whether the Commission has the authority to use a PLA, we do not discuss it here.

15

into New Jersey's interstate compacts," and would debilitate bi-state entities to which New Jersey is a party.

The DRPA agrees that the appellate court erred by "flipp[ing] the burden onto the Commission to show 'substantial[ly] similar' state law <u>authorizing</u> inclusion of [a] PLA requirement." Because "the Compact's expansive grants of authority . . . are broad enough to encompass inclusion of a PLA requirement in a construction contract," the DRPA submits, the burden should have been on Harms to identify substantially similar state laws barring the use of PLAs that would have limited the Commission's power. More generally, the DRPA explains, the Appellate Division's decision would "effectively paralyze interstate entity operations." Interstate compacts "typically contain broad general descriptions of authorized powers," the DRPA maintains, so "virtually any action by an interstate entity will at some level involve details or aspects not specifically addressed in its compact."

The Attorney General concurs, maintaining that the "broad powers" afforded to the Commission in the Compact "logically include the ability to sign [PLAs]," and that "[b]ecause the Commission's authority came from its organic compact, it had no need to rely on separate" generally applicable legislation authorizing PLAs. Urging us to construe the Compact under traditional contract-law principles, the Attorney General explains that the

16

question is not whether the text expressly mentions PLAs, but whether its broad language confers upon the Commission "sufficient authority" to use them. Ballinger, says the Attorney General, should be properly understood as reflecting how New Jersey "courts evaluate the applicability of other [generally applicable] state laws, not how they construe [an interstate] compact itself." According to the Attorney General, when "the ordinary meaning of [a compact's] terms allows the action, even if not mentioned expressly," nothing else is needed. Finally, the Attorney General notes that New Jersey is a member of nine bi-state or interstate entities created by compact, and the Appellate Division's decision creates "significant confusion" for each.

Amici Building Trades similarly assert that the Appellate Division "turned the Ballinger test upside down" by using a lack of complementary or parallel legislation to restrain the Commission's discretion to use PLAs. Local 825 asks this Court to acknowledge "the tension between the 'express intent' test set forth" by the Third Circuit and the "'complementary and parallel test' set forth in Ballinger," and to "affirmatively adopt the Third Circuit's 'express intent' test."

B.

Harms argues that "[a] bi-state entity's powers are limited to acts that are either expressly mentioned in its compact or authorized by complementary or

17

parallel laws of the creator states." This is especially true for PLAs, Harms maintains, which are "anticompetitive," "highly controversial," and "unique." Therefore, according to Harms, for the Commission to be authorized to use a PLA, the Compact's text must expressly grant the Commission that authority -- the ability to use a PLA "cannot be read into" more general grants of authority in the Compact. The fact that the Compact does not directly mention PLAs is therefore "fatal." Harms also contends that Pennsylvania and New Jersey specifically amended the Compact "to limit the Commission's procurement powers to those allowed under both states' competitive bidding policies," and the PLA is not allowed under those policies. Harms asserts that, without express authority in the Compact, Ballinger's complementary or parallel test remains the correct standard, and we should not overrule it in favor of the Third Circuit's express intent standard. Under Ballinger, Harms maintains, the Commission cannot use PLAs because New Jersey and Pennsylvania "do not share complementary or parallel legislation regarding PLAs."

### III.

### A.

This appeal turns on our interpretation of the Compact, through which New Jersey and Pennsylvania created the Commission and granted it certain powers.

18

The Compact Clause of the United States Constitution declares that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. Under the Compact Clause, "each State possesses the sovereign authority to enter into a compact with another State, subject to Congress's approval." New York v. New Jersey, 598 U.S. 218, 220 (2023).

Once Congress approves an interstate compact, the compact becomes the "law of the Union." Cuyler v. Adams, 449 U.S. 433, 438 n.7 (1981). The U.S. Supreme Court has thus held that "the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question." Id. at 438; see also Int'l Union of Operating Eng'rs, Loc. 68, AFL-CIO v. Del. River & Bay Auth., 147 N.J. 433, 440 (1997) ("[T]he consent of Congress transforms the States' agreement into federal law under the Compact Clause.").

"Interstate compacts are construed as contracts under the principles of contract law." Tarrant Reg'l Water Dist. v. Herrmann, 569 U.S. 614, 628 (2013). To interpret an interstate compact, "as with any contract, we begin by examining the express terms of the Compact as the best indication of the intent of the parties." Ibid. Because contract interpretation is a question of law we review de novo, we "pay no special deference to the trial court's interpretation

19

and look at the contract with fresh eyes." <u>Kieffer v. Best Buy</u>, 205 N.J. 213, 223 (2011).

States generally enter into compacts creating interstate entities to manage regional issues that impact multiple states, in order to: "address interests and problems that do not coincide nicely either with the national boundaries or with State lines -- interests that may be badly served or not served at all by the ordinary channels of National or State political action." <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 40 (1994) (internal quotations omitted). In so doing, states "shift[] a part" of their sovereign authority "to another state or states, or to the agency the . . . states jointly create to run the compact." <u>Id.</u> at 42 (internal quotations omitted).

Bi-state entities thus "occupy a significantly different position in our federal system than do the States themselves." <u>Id.</u> at 40. Whereas the States "as separate sovereigns, are the constituent elements of the Union," bi-state entities "are creations of three discrete sovereigns: two States and the Federal Government." <u>Ibid.</u>[4]

---

[4] In <u>State v. Murphy</u>, 36 N.J. 172, 186 (1961), we stated that the Waterfront Commission of New York Harbor "is not a separate level of government somewhere between the federal government and the contracting states. It is part of the government of each of the states. . . . As the agent of each state, the [Waterfront] Commission is subject to all of its laws, whether of statutory or common law origin, except insofar as the states agreed expressly or by fair

20

Here, "[b]y compacting together to form the Commission, New Jersey and Pennsylvania have each surrendered a portion of their sovereignty over certain Delaware River bridge operations in order to better serve the regional interest." Int'l Union of Operating Eng'rs, Loc. 542 v. Del. River Joint Toll Bridge Comm'n (Local 542), 311 F.3d 273, 276 (3d Cir. 2002).

B.

Ballinger's complementary or parallel state law test and the Third Circuit's express intent standard are two competing analyses for when a bi-state compact can be amended by subsequent generally applicable law of the compacting states. In Ballinger, we held that "the subsequent laws of one compacting state will apply to a bi-state agency" if both states have "complementary or parallel" legislation on the topic in question, even if that legislation does not mention the bi-state entity, or if "the common law" of the two states on the topic, which again does not mention the bi-state entity, is "substantially similar." 172 N.J. at 595-99. In Local 542, the Third Circuit explicitly rejected the Ballinger test and held that subsequent legislation will amend an interstate compact only if both states "exhibit[] [an] express intent to

_____

implication to place it beyond them." We then quoted this language in Ballinger. See 172 N.J. at 597. To the extent Murphy's language conflicts with the Supreme Court's holding in Hess, it was overruled, and in Ballinger, the Court erred in relying on it.

21

amend the Compact" or apply the subsequent legislation to the interstate entity in question. 311 F.3d at 280 ("We cannot subscribe to the view espoused by the New Jersey Supreme Court . . . that the mere existence of similar public policies set forth in each state's collective bargaining laws is enough to imply an intent on the part of both states to amend the Compact and apply those laws to the Commission."). Under the Third Circuit's test, substantially similar state common law can never amend an interstate compact. Id. at 278-81.

IV.

We hold that the plain language of the Compact authorizes the Commission to require the use of a PLA in a publicly bid construction project. The Commission's ability to do so is not constrained by Ballinger. We therefore reverse the Appellate Division's judgment and remand to the trial court for further consideration of any matters that are appropriately before it.

A.

As an initial matter, we agree with the Appellate Division that although construction on the Scudder Falls Bridge is complete, the question of whether the Compact authorizes the Commission to use a PLA in one of its construction projects is "an issue of public importance that is capable of repetition yet evades review." State v. Pinkston, 233 N.J. 495, 503 (2018) (internal quotation omitted). The question is capable of repetition because the

22

Commission may require a PLA as part of a future bid solicitation. And it evades review because construction projects can move more swiftly than court cases, as the Scudder Falls project did here. The completion of a particular project thus does not insulate from review whether the Commission has the authority to use PLAs generally.

B.

The Commission's powers are determined first and foremost by the "express terms" of the Compact. Tarrant, 569 U.S. at 628. Looking to the plain text of the Compact, New Jersey and Pennsylvania granted the Commission extremely broad authority within its jurisdiction: bridges across the Delaware River.

The Commission has the power to construct bridges, and replace existing bridges, across the Delaware River north of Philadelphia County. N.J.S.A. 32:8-11(a), (b); 36 Pa. Stat. Ann. § 3401 art. X(a), (b). In doing so, it can "enter into contracts." N.J.S.A. 32:8-3(h); 36 Pa. Stat. Ann. § 3401, art. II(h). And it has the authority "[t]o determine . . . all other matters in connection with, any and all improvements or facilities," which it has the power to construct. N.J.S.A. 32:8-3(n); 36 Pa. Stat. Ann. § 3401, art. II(n).

Additionally, with the exception of the "power to levy taxes," the Commission may "exercise all other powers, not inconsistent with" the United

23

States, Pennsylvania, or New Jersey Constitutions "which may be reasonably necessary or incidental" to constructing or replacing bridges, entering into contracts, or determining all matters in connection with its facilities. N.J.S.A. 32:8-3(p); 36 Pa. Stat. Ann. § 3401, art. II(p). And with regard to its property and affairs, the Commission may exercise "any and all powers which might be exercised by a natural person or a private corporation." Ibid.

The use of the words "all" and "any and all" in the grants of authority "[t]o determine . . . all other matters in connection with, any and all improvements or facilities," "[t]o exercise all other powers . . . which may be reasonably necessary or incidental to the effectuation of its authorized purposes," and to exercise "any and all powers which might be exercised by a natural person or a private corporation," denotes powers that are far-reaching and comprehensive. N.J.S.A. 32:8-3(n), (p); 36 Pa. Stat. Ann. § 3401, art. II(n), (p). In addition, "the fact that Pennsylvania and New Jersey expressly reserved their taxing power -- but not other powers" in Article II(p), supports the conclusion that they did not intend to excise other powers from those "reasonably necessary or incidental" to the Commission's work. Del. River Joint Toll Bridge Comm'n v. Sec'y Pa. Dep't of Labor & Indus., 985 F.3d 189, 196 (3d Cir. 2021); N.J.S.A. 32:8-3(p); 36 Pa. Stat. Ann. § 3401, art. II(p).

24

Taken together, these grants of authority are broad enough to encompass the power to require that a party with whom the Commission contracts to build a bridge across the Delaware River sign a PLA. This is true even though the phrase "Project Labor Agreement" does not appear in the text of the Compact. And it is true even though New Jersey and Pennsylvania could not have specifically contemplated the use of PLAs when they entered into the Compact in 1934, because PLAs did not yet exist. As the Commission and amici point out, the Compact does not expressly grant the Commission the power to open bank accounts, purchase smart phones, allow staff to work remotely during a pandemic, or install lawn sprinklers, but the Commission's authority to borrow money, enter into contracts, appoint employees and fix their compensation, and make improvements to real property clearly embrace those actions, even if some of them could not have been contemplated in 1934.

So too with PLAs. The broad power to construct and replace bridges, enter into contracts, "determine . . . all other matters in connection with, any and all improvements or facilities," and "exercise all other powers . . . which may be reasonably necessary or incidental" to any enumerated powers clearly encompasses the power to require that a construction company with whom the Commission contracts to build a bridge sign a PLA. Despite Harms'

25

contention, there is simply no carve-out in the plain text of the Compact for actions that are "highly controversial" or "unique."

C.

We reject Harms' assertion that the Compact cannot authorize use of a PLA because Pennsylvania and New Jersey amended it "to require the commission to competitively bid contracts in accordance with the public policies of [both states]." N.J.S.A. 32:8-3.8(d); 36 Pa. Stat. Ann. § 3401.11(4).

Although the New Jersey and Pennsylvania legislatures amended the statutes that constitute the Compact in 1994 and 1996, respectively, the States never presented those amendments to Congress for approval, and Congress never approved them. It is thus not clear that the Compact itself was properly amended.

Even assuming that it was, the actual amendments do not help Harms. Harms points to language in which each legislature "finds and declares that . . . it is in the best interest of the public to supplement or limit the powers of the commission . . . to require the commission to competitively bid contracts in accordance with the public policies of the State of New Jersey and the Commonwealth of Pennsylvania." N.J.S.A. 32:8-3.8(d); accord. 36 Pa. Stat. Ann. § 3401.11(4).

26

But that language is not operative law; it is part of the legislative findings and declarations. Although "[a] court may turn to a statute's preamble as an aid in determining legislative intent," DiProspero v. Penn, 183 N.J. 477, 496 (2005), "[o]rdinarily, the contents of the preamble are not given substantive effect, particularly where the enacting portion of the ordinance is expressed in clear and unambiguous terms," PRB Enters., Inc. v. S. Brunswick Plan. Bd., 105 N.J. 1, 5-6 (1987).

Here, the operative portion of the amendments provide:

> The Delaware River Joint Toll Bridge Commission, in the exercise of its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, shall adopt standing operating rules and procedures requiring that . . . no contract on behalf of the commission shall be entered into for the doing of any work, or for the hiring of equipment or vehicles, where the sum to be expended exceeds $10,000 unless the commission shall first publicly advertise for bids therefor, and requiring that the commission award the contract to the lowest responsible bidder . . . .
>
> [N.J.S.A. 32:8-3.9(a); accord. 36 Pa. Stat. Ann. § 3401.12.]

The Scudder Falls Bridge project fulfilled those requirements. The Commission both publicly advertised for bids and awarded the contract to the lowest responsible -- indeed, the only -- bidder. Therefore, even if the

27

Compact was successfully amended in 1994 and 1996, the Commission fulfilled the two obligations the amendments imposed.

D.

Because the powers granted to the Commission in the Compact encompass the power to use a PLA, the Appellate Division erred when it sought to ascertain whether New Jersey and Pennsylvania have "complementary and parallel" state laws, completely apart from the Compact, that authorize the use of PLAs. When two states confer a power on a bi-state entity within the four corners of an interstate compact, there is no basis to look beyond the compact, to other state laws of general applicability that do not mention the compact at all, to determine whether that power exists. As the Attorney General points out, even under <u>Ballinger</u> itself, its test does not apply when "the dispute is whether an agency acted within its authority under the organic compact." That is so because <u>Ballinger</u> has nothing to say about how a court construes a compact.

Here, because the Compact's text encompasses the authority to use a PLA, the Appellate Division erred in looking beyond the Compact to determine whether other New Jersey and Pennsylvania laws and policies that do not mention the Commission authorize the use of PLAs. After undertaking a meticulous review, the Appellate Division concluded "there is no unanimity

28

of Pennsylvania and New Jersey law regarding PLAs" outside of the Compact. Bridge Comm'n, 475 N.J. Super. at 355. As the Commission and amici note, that meant that even if Ballinger applied, the text of the Compact controls and the Commission's authority to use PLAs remains unconstrained because New Jersey and Pennsylvania do not have complementary or parallel state laws banning the use of PLAs.

The Appellate Division therefore erred in holding that the lack of complementary or parallel state law on PLAs meant that the Commission could not use a PLA even though that power falls comfortably within the authority granted in the Compact. Because even if Ballinger were to apply, New Jersey and Pennsylvania have no complementary or parallel state laws banning PLAs that would restrict the powers granted to the Commission in the Compact, we need not reach the Commission and amici's argument that Ballinger "collides with the Compact Clause of the United States Constitution" and should be overruled in favor of the Third Circuit's "express intent" test.

V.

The judgment of the Appellate Division is reversed, and the case is remanded for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and NORIEGA join in JUSTICE WAINER APTER's opinion. JUSTICES PIERRE-LOUIS and FASCIALE did not participate.

29